NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-6095-11T3

NEW JERSEY STATE (DIVISION
OF STATE POLICE),

       Appellant,

  v.

NEW JERSEY STATE TROOPER
CAPTAINS ASSOCIATION,

       Respondent.

_____

> **APPROVED FOR PUBLICATION**
>
> **June 8, 2015**
>
> **APPELLATE DIVISION**

Argued October 8, 2014 — Decided June 8, 2015

Before Judges Fuentes, Ashrafi and Kennedy.

On appeal from the New Jersey Public Employment Relations Commission, Docket No. RO-2006-087.

Steven W. Suflas argued the cause for appellant (Ballard Spahr, attorneys; Mr. Suflas and William K. Kennedy, on the briefs).

Marcia J. Mitolo argued the cause for respondent (Limsky Mitolo, attorneys; Ms. Mitolo, of counsel and on the brief).

Don Horowitz, Acting General Counsel, attorney for respondent New Jersey Public Employment Relations Commission (Mary E. Hennessy-Shotter, Deputy General Counsel, on the statement in lieu of brief).

    The opinion of the court was delivered by

KENNEDY, J.A.D.

The State of New Jersey, Division of State Police (Division), appeals a New Jersey Public Employment Relations Commission (PERC) determination that, with some exceptions, State Police captains are not "managerial executives" as that term is defined in N.J.S.A. 34:13A-3(f), and therefore are eligible to join collective negotiations units. The Division argues, among other things, that the PERC determination violates the plain language of the statute; uses a flawed "two-pronged" analysis in reaching its conclusion; and contravenes public policy. We have considered these arguments in light of the law and the record, and we affirm.

1. Background.

In June 2006, the New Jersey State Troopers Captains Association (Association) filed a petition with PERC in which it sought to represent a collective negotiations unit of captains employed by the Division. The Division opposed the petition and asserted that captains are managerial executives or confidential employees ineligible for inclusion in any negotiations unit under the New Jersey Employer-Employee Relations Act, N.J.S.A. 34:13A-1 to -39 (the Act). After thirteen days of hearings, the record was closed on May 8, 2008, and the hearing officer subsequently issued her report and findings in which she held that, with some exceptions, captains are neither managerial

2                                                          A-6095-11T3

executives nor confidential employees as defined by the statute in force at that time, and therefore are eligible for inclusion in an appropriate negotiations unit.

PERC adopted, with some modifications, the hearing officer's report and decision. The Division filed an appeal, but moved for a remand to PERC after the Legislature amended N.J.S.A. 34:13A-3(f) on January 8, 2010. We granted the State's motion and did not retain jurisdiction.

The hearing officer then held five additional days of hearings, following which she recommended that most captains are eligible for representation because their responsibilities and their role in creating policy for the Division placed them at a level below that of an "assistant commissioner" under the amended version of the statute. On January 28, 2012, PERC adopted the hearing officer's report and recommendations, with certain exceptions, and remanded the case to the Deputy Director of Representation to determine whether a majority of the eligible captains want to be represented by the Association. On September 5, 2012, the deputy director issued an order designating the Association as the exclusive agent for collective negotiations on behalf of the eligible captains.

This appeal followed.

### 2. The Facts.

The facts attendant upon this appeal are largely undisputed. What follows is a brief summary of the salient facts pertinent to the appeal. The Executive Branch of the State is comprised of fifteen principal departments and numerous independent agencies, boards, and commissions. The Division is a part of the New Jersey Department of Law and Public Safety and its core mission is to protect the public by investigating and preventing crimes, apprehending offenders, and providing homeland security. It is a paramilitary organization with a strict hierarchical structure that identifies its command officers through the use of military titles.

The head of the Division is the superintendent who holds the rank of colonel. The superintendent occupies a cabinet-level position and reports to the Attorney General and the Governor, and is responsible for the overall functioning of the Division. Two lieutenant colonels and three deputy superintendents occupy the next rung in the organization, and they report directly to the superintendent.

The Division is organized into four branches: administration, investigations, field operations, and homeland security; there is also the office of the chief of staff, which is essentially a fifth branch. Those five branches are each led

A-6095-11T3

by one of the two lieutenant colonels and three deputy superintendents.

The branches are, in turn, subdivided into sections supervised by majors who occupy the third tier in the leadership hierarchy. Sections are organizational units that are charged with various responsibilities within a branch. For example, the intelligence branch has a section focused upon "special investigations" and the administrative branch has sections for information technology and human resources management. Sections are then divided into bureaus and offices which are supervised by captains.

Most captains are circumscribed by the "chain of command" and are expected to communicate only with their immediate supervisors, as well as their subordinates, in carrying out their police functions. However, some captains are designated as "executive officers" and function as section supervisors, generally exercising greater authority than "regular" captains. For instance, these captains often act as intermediaries between other captains and their commanding majors, and interact more frequently with higher-tiered officers than other captains, often being tasked directly with formulating policies and procedures for the Division.

A-6095-11T3

Captains are expected to "guide" their subordinates and to administer the "day to day duties of their commands." They are also responsible for evaluating the performance of officers under their command and to make recommendations on personnel decisions.

In August 2006, the superintendent instructed each bureau to develop a strategic plan setting forth the bureau's long-term goals and operational objectives, its projected workload, its staffing requirements, and any anticipated capital improvements or equipment requirements. Although, in some cases, a strategic plan submitted to the supervising major by a bureau captain would be approved without significant changes, the plans were generally mutable and were subject to review and revision every six months.

In addition, the superintendent conducted monthly management accountability conferences with his second- and third-tier officers. Captains, with the exception of those designated as "executive officers," generally did not attend these conferences unless they were directed to do so by a senior officer. During those meetings, the participants used the strategic plans to gauge the performance of the particular group under review, and to monitor its progress in achieving its goals.

A-6095-11T3

As of 2008, the Division had a total of 4400 civilian and police employees. Police personnel included, in addition to the colonel, the lieutenant colonels and deputy superintendents, 14 majors, 49 captains, 198 lieutenants, 961 sergeants, 272 detectives and 1506 troopers. Nine captains served as executive officers.

On May 25, 2011, following our remand and additional hearings, the hearing officer issued her supplemental report. The report focused upon the various roles of assistant commissioners and Division captains. Assistant commissioners are generally appointed by the governor or their respective commissioners and deputy commissioners, and occupy the third tier in their organization's hierarchy. While they generally advise their commissioners on policy and legislative matters, not all assistant commissioners participate in policy development; some are appointed to monitor compliance with approved procedures and plans within the organization. Nonetheless, assistant commissioners interact frequently with their commissioners, help develop agency goals, oversee programs, formulate plans, and serve on boards, commissions, and special purpose committees.

By contrast, although some Division captains do regularly participate in policy development, the Division's strict chain

of command and the large number of mandated procedures and orders limit the discretion that captains may exercise and minimize the frequency and quality of their interaction with the superintendent, colonels, and deputy superintendents.

The hearing officer concluded that deciding whether captains were "managerial executives" under the statute required consideration of two factors, whether the captains: 1) were at or above the level of assistant commissioners; and 2) formulated policy. Applying that test to the record, she reaffirmed the exclusion of a limited number of captains, but concluded that the majority of Division captains were not "managerial executives" as the amendment defined the term, and that their limited participation in the strategic planning process did not constitute "formulating policy."

The Division challenged the report's use of a two-part test and asserted that, for executive branch employees, "the sole issue [was] whether captains are at or above the level of assistant commissioners," and proposed a three-step equivalency test identifying the basic minimal employment characteristics of assistant commissioners and of captains as a group, and comparing those characteristics for similarities.

On June 28, 2012, PERC adopted the hearing officer's conclusions in a well-reasoned thirty-page written decision that

considered the history of the Act and the legislative history of N.J.S.A. 34:13A-3(f), in particular. PERC held that captains, with few exceptions, did not formulate management policies and practices, and occupied the fourth-tier within the Division hierarchy. In considering the duties and responsibilities of Division captains, PERC found that those functions did not place captains "at or above" assistant commissioner level. PERC also determined that some captains were not eligible for inclusion because of the unique roles they filled within the Division.

PERC concluded, in part:

> We also are persuaded that captains are not at or above the level of assistant commissioner as most assistant commissioners are a single position appointed by the commissioner or the Governor indicating a high level position in government. The 45 captains in the division of State Police are promoted to the position from the rank of lieutenant and are not appointed. The Colonel and Attorney General are the only appointed positions in the Division.

> We are also not persuaded by the Division's arguments that captains must be excluded because they have a broad spectrum of responsibility; are commanding officers; receive the same training as higher ranked officers; are responsible for assessment and evaluation of their subordinates; and have similar salaries to assistant commissioners. We find that all of these factors point to the undisputed conclusion that captains are supervisors, but does not establish that they are at or above the level of assistant commissioner in the Division's organization.

PERC held the majority of Division captains were not "managerial executives," and directed the deputy director to assess whether the eligible employees wished to be represented by the Association. On September 5, 2012, the deputy certified the Association as the exclusive representative of the eligible Division captains, and this appeal followed.

### 3. The Law.

We commence with a review of the general principles governing appeals from final agency decisions and issues of statutory construction. Judicial review of administrative agency determinations is limited. Messick v. Bd. of Review, 420 N.J. Super. 321, 324 (App. Div. 2011). We accord the agency's exercise of its statutorily delegated responsibilities a "strong presumption of reasonableness," City of Newark v. Natural Res. Council Dep't Envtl. Prot., 82 N.J. 530, 539, cert. denied, 449 U.S. 983, 101 S. Ct. 400, 66 L. Ed. 2d 245 (1980), and defer to its findings of fact. Mazza v. Bd. of Trs., Police & Firemen's Ret. Sys., 143 N.J. 22, 29 (1995). "[T]he test is not whether an appellate court would come to the same conclusion if the original determination was its to make, but rather whether the factfinder could reasonably so conclude upon the proofs." Charatan v. Bd. of Review, 200 N.J. Super. 74, 79 (App. Div. 1985). Accordingly, we will not upset an agency determination

unless it was arbitrary, capricious or unreasonable, its findings lacked support in the evidence, or it violated the legislative grant of authority governing the agency. In re Herrmann, 192 N.J. 19, 27-28 (2007).

While we are not bound by an agency's decision on purely legal questions, we will give "substantial deference" to an agency's interpretation of those statutes the agency enforces. Richardson v. Bd. of Trs., Police & Firemen's Ret. Sys., 192 N.J. 189, 196 (2007). If the statute is ambiguous or silent on a particular point, we may not substitute our judgment for that of the agency provided the agency's determination is "based on a permissible construction of the statute." Kasper v. Bd. of Trs. of the Teachers' Pension & Annuity Fund, 164 N.J. 564, 581 (2000) (quoting 2 Am. Jur. 2d Administrative Law § 525 (1994) (footnotes omitted)).

The primary goal of statutory analysis is to understand and implement the Legislature's intent. State v. Rangel, 213 N.J. 500, 508 (2013). "The Legislature's intent is the paramount goal when interpreting a statute and, generally, the best indicator of that intent is the statutory language." DiProspero v. Penn, 183 N.J. 477, 492 (2005) (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)). In interpreting a statute, we give words "'their ordinary meaning and significance,' recognizing,

[as we have noted], that generally the statutory language is 'the best indicator of [the Legislature's] intent.'" Tumpson v. Farina, 218 N.J. 450, 467-468 (2014) (alteration in original) (quoting DiProspero, supra, 183 N.J. at 492). We read each statutory provision "in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme." Wilson ex rel. Manzano v. City of Jersey City, 209 N.J. 558, 572 (2012). "[I]f there is ambiguity in the statutory language that leads to more than one plausible interpretation, we may turn to extrinsic evidence, including legislative history, committee reports, and contemporaneous construction." DiProspero, supra, 183 N.J. at 492-93 (citation and internal quotation marks omitted).

"We do not view words and phrases in isolation but rather in their proper context and in relationship to other parts of a statute, so that meaning can be given to the whole of an enactment." Ibid. Furthermore, when construing a statute, we presume that the Legislature created a logical scheme that avoids contradictions. See State v. Hudson, 209 N.J. 513, 542 (2012).

In St. Peter's Univ. Hosp. v. Lacey, 185 N.J. 1, 15-16 (2005), the Supreme Court stated:

> "[t]he meaning ascribed to legislation by the administrative agency responsible for its implementation, . . . is persuasive evidence of the Legislatures understanding of its enactment." <u>Cedar Cove, Inc. v. Stanzione</u>, 122 <u>N.J.</u> 202, 212 (1991) (citations omitted). Our conclusion is supported further by the unquestioned proposition that "[w]hen the Legislature expressly includes a requirement in one subsection and excludes that same requirement in other subsections of the same general statute, we need not strain to import that requirement where it is not." <u>In re Freshwater Wetlands Protection Act Rules</u>, <u>supra</u>, 180 <u>N.J.</u> [478,] 492 [2004].

Here, "PERC is charged with administering the [Act], <u>N.J.S.A.</u> 34:13A-1 to -29, and its interpretation of the Act is entitled to substantial deference." <u>CWA</u>, <u>Local 1034 v. N.J. State PBA, Local 203</u>, 412 <u>N.J. Super. 286</u>, 291 (App. Div. 2010) (citing <u>N.J. Tpk. Auth. v. AFSCME, Council 73</u>, 150 <u>N.J.</u> 331, 352 (1997)).

Guided by these principles, we turn to the statute that governs this dispute. The constitutional and legislative basis for the right of public employees to engage in collective negotiations is well-known and thus there is no need for us to trace that history here.[1] Very briefly, public employees are constitutionally entitled to engage in collective negotiations.

---

[1] <u>See generally</u> <u>N.J. Tpk. Auth. v. AFSCME, Council 73</u>, <u>supra</u>, 150 <u>N.J.</u> at 335, for a thorough examination of the history of the Act.

A-6095-11T3

N.J. Const., art. I, para. 19; Council of N.J. State College Locals v. State Bd. of Higher Educ., 91 N.J. 18, 25 (1982). Their representative organization is authorized to negotiate "terms and conditions of employment." N.J.S.A. 34:13A-5.3. However, while the Act applies broadly to "public employees," defined in N.J.S.A. 34:13A-3(d) to include "any person [] in the service of a public employer" but excluding, among others, "managerial executives," the Act did not originally define that term. In 1974, the Legislature clarified the exception for "managerial executives" by adding the following definition:

> "Managerial executives" of a public employer means persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of such management policies and practices, except that in any school district the term shall include only the superintendent or other chief administrator, and the assistant superintendent of the district.
>
> [L. 1974, c. 123, § 2 (codified as N.J.S.A. 34:13A-3).]

This statutory definition remained unchanged until the Legislature amended the Act in 2010.

The 2010 amendment to the Act provides:

> "Managerial executives" of a public employer, in the case of the State of New Jersey, means persons who formulate management policies and practices, but shall not mean persons who are charged with the responsibility of directing the effectuation

A-6095-11T3

> of such management policies and practices, <u>except that, in the case of the Executive Branch of the State of New Jersey, "managerial executive" shall include only personnel at or above the level of assistant commissioner.</u>
>
> [<u>N.J.S.A.</u> 34:13A-3(f) (emphasis added).]

The problem in applying the statutory exception in the case before us arises because the Division does not utilize the title of "assistant commissioner," and further, there is an obvious difficulty in comparing the role of an assistant commissioner in a primarily civilian regulatory agency with the role of a State police captain in a paramilitary organization involved in all aspects of law enforcement.

The Division argues that the statute presents no ambiguities in this case and that the only analysis permitted is whether captains in the State police are the "functional equivalents" of those who hold the title of assistant commissioners in other State agencies. The Division further argues that this "single-prong" test supports the conclusion that captains are "managerial executives" and that PERC erred by employing a "two-pronged test" requiring that captains both function at or above the level of assistant commissioner and also formulate management policies and practices to qualify for exclusion as managerial executives.

In our view, the proper application of the statute in this case cannot be gleaned from the plain language of the statute itself, given the unique structure of the Division as a paramilitary organization and the absence of the title of "assistant commissioner" in its organizational hierarchy. Consequently, we are justified in turning to extrinsic evidence, such as legislative history and committee reports, to assist us in our quest to understand the Legislature's intent in resolving the ambiguity in the statute. DiProspero, supra, 183 N.J. at 492.

In the statement accompanying the initial bill to amend N.J.S.A. 34:13A-3(f), it was very clear that the intent of the amendment was to broaden the categories of public employees eligible to participate in collective negotiations:

> Under the act's current definition, for the purposes of determining which public managers are subject to the provisions of the act, "managerial executives" are persons who formulate management policies and practices, and persons who are charged with the responsibility of directing the effectuation of those management policies and practices. This bill changes that definition so that in the case of the State as a public employer, "managerial executives" means persons who formulate management policies and practices, but does not include persons who are charged with the responsibility of directing the effectuation of those policies and practices . . . .

16

[Introduction Statement to Senate Bill No. 3071 (December 3, 2009) (Introduction); see also Statement of the Senate Labor Committee to Senate Bill No. 3071 (December 10, 2009) (reporting favorably on the bill and repeating verbatim the introduction statement) (Senate Statement).]

And further:

[T]he bill also specifies that, in the case of the Executive Branch of the State Government, "managerial executive" includes only personnel at or above the level of assistant commissioner . . . .

. . . .

By this change in definition, any manager employed by the Executive Branch of State Government at a level below the level of assistant commissioner, and any manager employed by the State who is not involved with formulating management policies and practices, may join employee organizations and through these organizations collectively negotiate salaries and benefits with public employers.

[Introduction, supra.]

To ensure that the amended Act would protect a larger segment of public employees, the Senate Statement explained:

This bill also changes the number of collective negotiations units for civilian employees of the Executive Branch of the State government from ten to twelve in order to add State government managers and deputy attorney generals to allow persons holding such positions to be covered under the act. For this purpose, the bill also amends current law to remove the confidential employee status of deputy attorneys general . . . .

17                                                    A-6095-11T3

[<u>Senate Statement</u>, <u>supra.</u>]

Subsequently, the Senate passed another amendment to ensure that investigators in the Division of Criminal Justice in the Department of Law and Public Safety would not be disqualified by virtue of their unclassified status. <u>Floor Statement to Senate Bill No. 3071</u> (January 7, 2010). These documents depict a clear legislative intent to broaden the reach of the Act to include more, rather than fewer, executive branch employees.

In arguing that PERC should not have adopted a two-pronged standard, the Division asserts that, where executive branch employees are concerned, the amended statute erases the policy-formulation component referenced at the beginning of the definition. The Division argues that the phrasing of the language indicates a legislative intent to impose on the executive branch the same one-pronged test that the Act applies to superintendents and assistant superintendents within school districts. We do not agree that the legislative intent is so clear in the case before us.

It is, by way of example, plausible that the Legislature only intended the language to apply to executive branch departments or agencies whose organizational structures included assistant commissioners, and that the first portion of the definition, which excludes "persons who formulate management

18                                                        A-6095-11T3

policies and practices," would address executive branch employees whose organizational structures did not include assistant commissioners. Cf. GE Solid State, Inc. v. Dir., Div. of Taxation, 132 N.J. 298, 308 (1993) ("Under the established canons of statutory construction, where the Legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded.").

In our view, the Division's arguments, while they are imbued with the virtue of simplicity, fail to take into account the generous deference we owe to an agency's construction of its controlling legislation and, further, misconstrue the effect of PERC's holding. The Division argues that PERC requires "managerial executives in the Executive Branch . . . both to formulate policies and practices and to serve at or above the level of assistant commissioner," and "would result in holding many Executive Branch employees to a higher standard than" assistant commissioner and "would lead to the illogical result that, despite his title, [an assistant commissioner who does not formulate policy] would not meet the definition of 'managerial executive[.]'"

However, that is not how we read the PERC decision. PERC did not require Division captains to demonstrate they did not create policy; rather, it treated the non-participation of

Division captains in policy matters as simply a factor for consideration in making the difficult decision about whether captains are excluded from collective negotiations under the statutory definition of "managerial executive." In our view, the PERC decision does not stand as precedent for the proposition that an executive branch employee holding the title of assistant commissioner who does not formulate policy is not a managerial executive under N.J.S.A. 34:13A-3(f). The core holding in the PERC analysis is that Division captains did not serve at or above the level of an assistant commissioner.

Simply because some captains and assistant commissioners in other executive branch departments share some similar duties does not mandate a different result here. PERC identified a number of differences between assistant commissioners and the Division captains in matters such as the means through which they obtained their positions, their compensation, the discretion they exercised, and the frequency and quality of their interactions with the departmental head. These facts provide ample support for PERC's determination.

The Division further argues that PERC's evaluation of the duties and functions of captains on a case-by-case basis creates uncertainty because captains often change assignments within the ranks. This argument is unpersuasive, however, given the

legislative intent to expand the participation of public employees in collective negotiations. PERC's individualized assessment of public employees advances that goal. Categorically excluding an entire group of employees, without regard to the variations that exist among the positions, would most often reduce the number of public employees eligible to participate in collective negotiations. Indeed, such a result is perfectly illustrated in the case before us in that most Division captains undertake the duties of line supervisors. It is illogical to deprive those captains of the right to collective negotiations simply because they share the same title with a smaller subset of captains tasked with duties akin to those of managerial executives. It is unlikely that the Legislature intended such a result. See Aponte-Correa v. Allstate Ins. Co., 162 N.J. 318, 323 (2000) (directing that statutory interpretation should account for the legislation's objectives and for commonsense); State v. Provenzano, 34 N.J. 318, 322 (1961) ("The goal of the interpretative process is the intent of the Legislature. It is axiomatic that a statute will not be construed to lead to absurd results.").

Moreover, the Division's arguments regarding the practicality of PERC's decision are unconvincing. The record contains no evidence that the movement of personnel within an

organization is unique to the Division, or that such changes would materially differ from those occurring in any other governmental agency.

Finally, we find no merit in the argument that permitting captains to undertake collective negotiations is contrary to public policy. The Legislature could have elected to exclude the Division captains from the process, but chose not to do so. We have observed that,

> While sound public policy and the weal of the people are the concern of all the government, and the [J]udiciary cannot properly shirk the obligation of this concern, in cases where the Legislature has clearly spoken it is the privilege of that body to establish public policy, and the [J]udiciary must not ignore the policy thus established on the ground that its views differ with those plainly expressed by the Legislature.
>
> [Ayres v. Dauchert, 130 N.J. Super. 522, 531-32 (App. Div. 1974).]

The remainder of the Division's arguments are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION