**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-1783-24
                 A-2034-24

PRIME PROPERTY & CASUALTY
INSURANCE, INC.,

       Plaintiff-Respondent,

v.

NV SERVICE INC., NV BUS SERVICE
INC., and MARCO MENDOZA-BASTIDAS,

       Defendants,

and

FUJI LINE INC., QUICK TRANSIT
MANAGEMENT AGENCY LLC,
THREE ACE'S TRANSPORTATION INC.,
B.K.T.E. EXPRESS CO. LLC, FUJI
EXPRESS, INC., and ADEL SAADALLA,

       Defendants-Respondents,

and

VALENTIN LOPEZ-CULAJAY,
and DAYANARA ANTUNEZ,

       Defendants-Appellants.

_____

PRIME PROPERTY & CASUALTY
INSURANCE, INC.,

     Plaintiff-Respondent,

v.

NV SERVICE INC., NV BUS SERVICE
INC. and MARCO MENDOZA-BASTIDAS,

     Defendants,

and

FUJI LINE INC., QUICK TRANSIT
MANAGEMENT AGENCY LLC, THREE
ACE'S TRANSPORTATION INC., B.K.T.E.
EXPRESS CO. LLC, FUJI EXPRESS, INC.,
and ADEL SAADALLA,

     Defendants-Appellants,

and

VALENTIN LOPEZ-CULAJAY and
DAYANARA ANTUNEZ,

     Defendants-Respondents.

_____

        Argued May 19, 2026 – Decided June 3, 2026

        Before Judges Mawla, Bishop-Thompson, and Puglisi.

        On appeal from the Superior Court of New Jersey, Law
        Division, Bergen County, Docket No. L-4500-24.

2

Francis X. Garrity argued the cause for Valentin Lopez-Culajay and Dayanara Antunez, appellants in A-1783-24 and respondents in A-2034-24 (Garrity, Graham, Murphy, Garofalo & Flinn, PC, attorneys; Francis X. Garrity, on the briefs).

Anthony J. Bianco argued the cause for Fuji Line Inc., Quick Transit Management Agency, LLC, Three Ace's Transportation Inc., B.K.T.E. Express Co. LLC, Fuji Express, Inc., and Adel Saadalla, appellants in A-2034-24 (Bertone Piccini LLP, attorneys; Anthony J. Bianco, on the briefs).

Sean P. Shoolbraid argued the cause for respondent Prime Property & Casualty Insurance, Inc. (Kennedys CMK, LLP, attorneys; David M. Kupfer, of counsel and on the briefs; Sean P. Shoolbraid, on the briefs).

PER CURIAM

In A-2034-24, defendants Fuji Line Inc.; Quick Transit Management Agency, LLC; Three Ace's Transportation Inc.; B.K.T.E. Express Co., LLC; Fuji Express, Inc.; and Adel Saadalla (collectively "Fuji parties"), and in A-1783-24 defendants Valentin Lopez-Culajay and Dayanara Antunez (collectively "injured parties"), appeal from a January 27, 2025 order granting partial summary judgment to plaintiff Prime Property & Casualty Insurance, Inc. We affirm.

This is an insurance coverage dispute, arising from a motor vehicle accident in Cliffside Park on July 8, 2021. The accident involved a 2003 Ford

E-450 bus operated by the Fuji parties. The bus driver was Marco Mendoza-Bastidas. The injured parties were passengers on the bus. Including the driver, the bus had a twenty-five-person capacity. Mendoza-Bastidas was permitted to operate the bus and had a driver's license at the time of the accident.

In July 2022, the injured parties sued NV Service Inc., Fuji Express Inc., and Mendoza-Bastidas for injuries they sustained from the accident. In July 2023, the injured parties filed a second lawsuit against NV Service Inc. and NV Bus Service Inc., the bus owners; the Fuji parties; and Mendoza-Bastidas. The trial court consolidated both suits.

Prime defended the Fuji parties and Mendoza-Bastidas in the personal injury action, which was scheduled for trial in December 2024. However, the trial was adjourned because Prime filed a complaint for a judgment declaring the claims against the Fuji parties and Mendoza-Bastidas were not covered. In January 2025, the parties entered a stipulation and consent order dismissing the personal injury matter without prejudice, pending the outcome of the declaratory judgment action.

Prime's insurance policy named the Fuji parties, except Saadalla, as insureds with a liability limit of $5,000,000 per occurrence. After paying the policy premium, Saadalla, acting on behalf of himself and the Fuji parties,

4

executed a Personal Guarantee and Indemnity Agreement on February 23, 2021.

The policy was effective from March 16, 2021 to March 16, 2022.

Section I of the policy titled, "Liability Coverage," reads in part:

A.  Insuring Agreement

1.  Subject to all of the terms, limitations, conditions, definitions, exclusions, and other provisions of this Policy, we will pay Damages in excess of any [self-insured retention (SIR)] that you are legally obligated to pay because of Bodily Injury or Property Damage to which this Policy applies if caused by an Accident and resulting from the ownership, maintenance, or use of a Insured Auto as identified in the Policy, on the Declarations or any Endorsement if:

. . . .

b.   You have complied with all the conditions set forth in Section VII – Conditions of the Policy, including without limitation all the reporting and notification requirements.

. . . .

e.  The Insured Auto is being operated by an Approved Driver at the time of the Accident.

. . . .

B.  Liability Exclusions

In the event that any of the exclusions stated in this Policy are found by a court of law to be unenforceable

5

or in contradiction to applicable law in regards to a specific Claim, the invalid provision is to be interpreted as providing the minimum insurance coverage required under the financial responsibilities laws, in place of the invalid exclusion, for such Claim.

The policy included form ACA-99-31, titled "Approved Driver Endorsement," which states, in part:

> This Endorsement changes the terms and conditions of the Policy, please read it carefully.
>
> The "insured" is responsible for following each of the procedures set forth in this Endorsement and for making sure that all drivers operating an "auto" meet each of the requirements set forth herein. In the event the "insured" does not follow the procedures set forth herein and/or in the event of a driver of an "auto" does not meet the requirements of this Endorsement at the time of any relevant Claim or Loss, the Insurer will have no duty to defend or indemnify any "insured" for any Claim or "loss", with exception to the minimum amount of insurance required by any applicable federal or state financial responsibility law.
>
> A. Mandatory MVR Review and Monitoring by "Insured":
>
> 1. For existing drivers, the "insured" must obtain and review a Motor Vehicle Record ("MVR") for each driver at the inception of the Policy to ensure each driver meets the qualifications set forth in this Endorsement. The "insured" must monitor the MVR for each driver to ensure that each and every driver remains in compliance with the qualifications set forth in this Endorsement.

A-1783-24

2. For new drivers hired after the inception date of this Policy, the "insured" must obtain and review an MVR and ensure the driver meets each of the qualifications set forth in this Endorsement. Thereafter, the "insured" must monitor the MVR of each driver and ensure that each and every driver remains in compliance with the qualifications set forth in this Endorsement.

B. Driver Qualifications:

To qualify as an "approved driver" without additional underwriting and premium, the driver must meet each of the following qualifications at a) the later of either the inception of the Policy or the hiring date of the driver and b) at the time of the relevant Claim or Loss:

. . . .

2. The driver may not have had any driver's license or CDL disqualifications or suspensions within the past five years unless by reason of:

    a. Delinquent child support payments;

    b. Failure to provide proof of insurance; or

    c. Failure to pay non-traffic related fines.

. . . .

C. Drivers Not Meeting Qualifications Subject to Underwriting and Additional Premium:

In the event the "insured" wishes to hire or continu[e] using a driver who does not meet the qualifications set forth herein, or who has fallen out of compliance with the qualifications set forth herein, the "insured" may submit the driver's information to the Insurer for further

7

underwriting review. In this case, the Insurer will quote an associated additional premium and/or surcharge which must be paid in advance of the driver qualifying as an "approved driver", and the aforementioned driver will be specifically scheduled to the Policy.

The Personal Guarantee, wherein the Fuji parties are identified as "Insured," includes a "Recitals" section which provides, in part:

> 1. In consideration for the representations contained herein and other good and valuable consideration, Prime has agreed to issue a policy of commercial auto and/or motor truck cargo insurance to the Insured (the "Policy") . . . . Coverage may be limited to vehicles, drivers and/or cargo that is specifically scheduled on the Policy. Despite these limitations, Prime may be obligated to pay certain claims pursuant to federal or state financial responsibility laws . . . or other similar regulations (collectively, "Financial Responsibility Law(s)"). Even where Prime is required to make payments for such claims, it is the intent and understanding of the Insured that such claims are considered "Non-Covered Claim(s)" and are subject to this Agreement (if the Policy is limited to vehicles, drivers and/or cargo specifically scheduled on the Policy).
>
> . . . .
>
> 3. The Insured has the responsibility to reimburse Prime for any Non-Covered Claim which Prime must pay as a result of any Financial Responsibility Law.
>
> 4. The Insured intends to prevent the occurrence of Non-Covered Claims that would expose Prime to any obligations under any Financial Responsibility Law. Accordingly, the Insured agrees that it will, when

8

required by the Policy, schedule all vehicles, drivers and/or cargo with Prime by providing underwriting information required by Prime and paying all applicable premiums or other fees.

The "Agreement" section of the Personal Guarantee provides, in part:

1. Indemnity

The Insured agrees to indemnify, defend and hold Prime harmless from any and all losses or claims arising out of a Non-Covered Claim. The Insured acknowledges its obligations to Prime for a Non-Covered Claim are not limited by the Limits of Liability of the Policy, and include attorney's fees and costs incurred in an effort to enforce this Agreement.

. . . .

4. Insured's obligation to notify Prime of Non-Covered Claims.

It is the Insured's intent that Prime shall not have a duty to defend any Non-Covered Claims, nevertheless, the Insured shall give immediate written notice that it may be called upon to cover a Non-Covered Claim, pursuant to Financial Responsibility Laws.

. . . .

5. Prime's option to defend, investigate or settle Non-Covered Claims.

Subject to applicable Financial Responsibility Laws, the Insured agrees that Prime does not have any duty to defend or settle any Non-Covered Claim. Prime shall, however, have the right to become involved in the

defense, or to defend or settle any Non-Covered Claim. Prime's election to assume the defense of a case shall allow Prime to solely control the investigation and defense, including the selection of counsel. Prime also may negotiate toward settlement up to the applicable potential exposure to Prime under the MCS-90 Endorsement or state or federal financial responsibility endorsement, if such a settlement is, in Prime's judgment, appropriate.

Because the Insured is responsible to reimburse Prime for Non-Covered Claims, the Insured may elect to directly settle with any claimant without violating this Agreement, so long as the Insured promptly and directly pays the agreed settlement from its own funds, without looking to Prime for any funding toward such a settlement, and so long as the insured obtains a full and complete release of all claims against all Insureds under the subject Policy.

6. Insured's obligations if Prime elects to defend, investigate[,] or settle a Non-Covered Claim, or is required to pay a Non-Covered Claim.

If Prime elects, at its sole option and discretion, to defend, investigate[,] or settle a Non-Covered Claim, the Insured agrees to fully cooperate with Prime in regard to that defense.

The Insured further agrees to promptly reimburse Prime for:

. . . .

c. All amounts Prime pays in settlement or to indemnify any Insured in regard to any Non-Covered Claim;

10

. . . .

7. Premiums, SIRs, and/or deductibles.

> The Insured further agrees to pay all premiums (SIRs), and/or deductibles owed under the terms of the Policy, including but not limited to the minimum earned premium due. The Insured further agrees to reimburse and indemnify Prime for any and all attorney fees and costs incurred in an effort to enforce this Agreement.

After Prime received the claim, it issued a letter to the Fuji parties and Mendoza-Bastidas with its findings related to the accident, relevant provisions of the policy, conclusions regarding coverage, and a reservation of rights. The letter declined coverage because Mendoza-Bastidas did not qualify as an approved driver under the Approved Driver Endorsement since his license had been suspended for failing to pay a traffic fine on November 13, 2019, which was within five years of the Policy's inception. Prime's letter also stated "coverage may be precluded" because the Fuji parties were required to notify Prime of the accident within seventy-two hours of its occurrence, and instead notified Prime one month after the accident. The letter stated "[c]overage will still be provided for the claims arising from the . . . accident pursuant to the applicable financial responsibility requirements, namely the MCS-90 Endorsement or . . . [S]tate financial responsibility laws" but "to the extent Prime is required to make payments pursuant to those requirements, [the] Fuji [parties

11

are] obligated to reimburse Prime." The letter advised "Prime is not denying coverage at this time, it merely reserves the right to do so."

Prime's declaratory judgment action named the injured parties, Fuji parties, Mendoza-Bastidas, NV Service Inc., and NV Bus Service Inc. as defendants. The complaint was later amended to seek a "judgment declaring the rights and obligations of the parties, if any, under . . . [the] policy" and "judgment against certain defendants for contractual indemnification, damages, interest, and costs of suit."

Prime moved for summary judgment in the declaratory judgment action. Its motion was supported by a statement of undisputed material facts along with supporting certifications and exhibits. The motion sought a judgment declaring the policy did not afford coverage for the claims and causes of action alleged in the complaints filed by the injured parties in the personal injury action. Prime asserted the Policy did not afford coverage to the Fuji parties or Mendoza-Bastidas because he was not an "approved driver." It argued if coverage exists, it would be limited to $25,000 per occurrence, pursuant to N.J.S.A. 48:4-47. Prime reiterated it sought reimbursement pursuant to the Personal Guaranty and Indemnity Agreement for all payments made on the personal injury claims, including attorneys' fees, costs, expenses, and settlement fees.

12

The Fuji parties filed a notice of appearance. The injured parties filed a response to Prime's statement of undisputed facts, and a cross-motion for summary judgment accompanied by a counterstatement of material facts. The Fuji parties later joined the injured parties' cross-motion, filing an opposition to the motion, and a response to Prime's statement of undisputed facts along with a certification from Saadalla in support of the cross-motion.

The injured and Fuji parties sought a judgment declaring coverage under the policy extended to both the named insureds and permissive users involved in the accident to the policy limit because the policy is subject to State and federal financial responsibility laws, which mandate the minimum limit of liability for a bus with a passenger capacity of sixteen or more is $5,000,000. They argued Prime should not be allowed to enforce the policy as it failed to provide mandated coverage for permissive users. They also argued summary judgment was premature because discovery had not concluded.

The trial court issued a written opinion. It found the policy must extend coverage to Mendoza-Bastidas under its omnibus provisions, as he was a permissive user of the bus at the time of the accident. However, because his license was suspended within five years of the policy's inception, he was not an "approved driver" under the policy at the time of the accident. Pursuant to the

A-1783-24

Approved Driver Endorsement, Prime had "no duty to defend or indemnify any 'insured' for any Claim or 'loss', with the exception of the minimum amount of insurance required by any applicable federal or state financial responsibility law."

The trial court found N.J.S.A. 48:4-47 is the applicable financial responsibility law. The statute imposes a mandated liability minimum of $25,000 per occurrence. The court rejected the injured parties' contention "pursuant to N.J.S.A. 39:5B-32 and N.J.A.C. 13:60-2.1, [New Jersey] has adopted the minimum liability limits of [$5,000,000] per occurrence applicable under 49 C.F.R. 387 for for-hire motor carriers of passengers with a seating capacity of sixteen passengers or more." It found 49 C.F.R. 387 "is explicitly only applicable to 'for-hire motor carriers transporting passengers in interstate or foreign commerce.'"

Discovery was not necessary because the undisputed facts in the record, derived from Mendoza-Bastidas's deposition and emails sent by Saadalla, showed the Fuji parties did not operate the bus for interstate travel at the time of the accident. Also, the Fuji parties had failed to respond to Prime's discovery requests regarding this issue.

A-1783-24

On January 27, 2025, the trial court entered an order accompanying its opinion, partially granting Prime's motion for summary judgment. The order required Prime to extend coverage to the Fuji parties and Mendoza-Bastidas "according to the minimum liability limits of $25,000[] per occurrence for" the claims asserted by the injured parties. Further, "Prime shall be entitled to be reimbursed by the Fuji Parties and Saadalla for any payment it makes on account of the claims, causes of action, and damages that have been or may be asserted" by the injured parties. The order also reflected the court granted the portion of the injured and Fuji parties' cross-motions for summary judgment seeking coverage under the Policy but denied their request to establish a liability limit of $5,000,000.

I.

A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." R. 4:46-2(c). The court must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the

15

alleged disputed issue in favor of the non-moving party." Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995).

"To decide whether a genuine issue of material fact exists, the trial court must 'draw[] all legitimate inferences from the facts in favor of the non-moving party.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (alteration in original) (quoting Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016)). "The court's function is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" Rios v. Meda Pharm., Inc., 247 N.J. 1, 13 (2021) (quoting Brill, 142 N.J. at 540). "If there is no genuine issue of material fact, [the court] must then 'decide whether the trial court correctly interpreted the law.'" DepoLink Ct. Reporting & Litig. Support Servs. v. Rochman, 430 N.J. Super. 325, 333 (App. Div. 2013) (quoting Massachi v. AHL Servs., Inc., 396 N.J. Super. 486, 494 (App. Div. 2007)).

"Summary judgment should be granted . . . 'after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" Friedman, 242 N.J. at 472 (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). However, summary judgment is not meant to "shut a deserving litigant from

16

[their] trial," <u>Brill</u>, 142 N.J. at 540 (quoting <u>Judson v. Peoples Bank & Tr. Co.</u>, 17 N.J. 67, 77 (1954)), nor is it appropriate when discovery is incomplete and critical facts are within the moving party's knowledge. <u>Friedman</u>, 242 N.J. at 472.

A party opposing summary judgment must provide evidence "beyond mere speculation and fanciful arguments." <u>Cortez v. Gindhart</u>, 435 N.J. Super. 589, 605 (App. Div. 2014) (quoting <u>Hoffman v. Asseenontv.com, Inc.</u>, 404 N.J. Super. 415, 426 (App. Div. 2009)) (internal quotation marks omitted). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." <u>Puder v. Buechel</u>, 183 N.J. 428, 440-41 (2005). "If the evidence [submitted by the non-movant] is merely colorable or is not significantly probative, summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (citations omitted). Bare conclusions, "without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." <u>Brae Asset Fund, L.P. v. Newman</u>, 327 N.J. Super. 129, 134 (App. Div. 1999) (quoting <u>U.S. Pipe & Foundry Co. v. Am. Arb. Ass'n</u>, 67 N.J. Super. 384, 399-400 (App. Div. 1961)).

We review the grant or denial "of a motion for summary judgment de novo, applying the same standard used by the trial court." <u>Samolyk v. Berthe</u>,

251 N.J. 73, 78 (2022). On de novo review, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." Rowe v. Bell & Gossett Co., 239 N.J. 531, 552 (2019) (alteration in original) (quoting Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)).

## II.

In A-1783-24, the injured parties argue the trial court erroneously concluded the federal standard under 49 C.F.R. 387 only applies to buses "in interstate or foreign commerce," and not to intrastate transportation. They assert New Jersey has adopted the federal financial responsibility standard of $5,000,000 for commercial buses with a seating capacity of sixteen or more passengers and exceeding 10,000 pounds in gross vehicle weight. By virtue of participating in the Motor Carrier Safety Assistance Program (MCSAP), 49 U.S.C. § 31102, states agree to adopt and enforce commercial motor vehicle safety regulations, standards, and orders compatible with the regulations, standards, and orders of the federal government.

New Jersey has chosen to participate in the MCSAP through its enactment of N.J.S.A. 39:5B-32, which requires the Superintendent of the State Police to adopt "rules and regulations concerning the qualifications of interstate motor

carrier operators and vehicles, which shall substantially conform to the requirements established pursuant to sections 401 to 404 of the 'Surface Transportation Assistance Act of 1982,'" Pub. L. 97-424 (previously codified as 49 U.S.C. §§ 2301-2304, now codified as 49 U.S.C. §§ 31101-31104). N.J.S.A. 39:5B-32(b)(2) provides an exception for commercial buses designed to carry sixteen or more passengers, including the driver, and subsection (e) expressly references 49 C.F.R. 387, which governs financial responsibility requirements for commercial vehicles operating in interstate commerce, including buses with a capacity of sixteen or more passengers, inclusive of the driver.

The Superintendent promulgated N.J.A.C. 13:60-2.1, adopting the federal regulations, including 49 C.F.R. 387. 49 C.F.R. 387.33 provides a $5,000,000 limit for buses with a passenger capacity of sixteen or more. N.J.A.C. 13:60-2.1(d)(1)(ii) modified the federal definition of "commercial motor vehicle," defining it as "any . . . motor vehicle used on a highway in intrastate commerce to transport passengers or property when the vehicle . . . [i]s designed or used to transport more than [eight] passengers (including the driver) for compensation." According to the injured parties, this reference and redefinition of "commercial motor vehicle" reflects the State's intent to include buses.

The Superintendent also promulgated N.J.A.C. 13:60-1.3, which defines "intrastate commerce" as "trade, traffic, or transportation in this State which is not 'interstate commerce.'" Subparagraph (d) of the regulation expressly provides the term "interstate," as adopted from the federal regulations, shall encompass "both 'interstate' and 'intrastate' transportation in commerce." Thus, under N.J.A.C. 13:60-2.1, "commercial motor vehicle" encompasses commercial buses used on highways in intrastate commerce to transport passengers, with a passenger capacity of eight or more.

The injured parties contend the bus here had a passenger capacity of twenty-five, including the driver. Since New Jersey adopted the federal standards and applied those standards to intrastate transportation of commercial motor vehicles, including buses with a passenger capacity of sixteen or more, Prime's financial responsibility is $5,000,000 per occurrence.

The injured parties assert Prime's unsupported argument our Legislature's adoption of a separate statutory insurance scheme for autobuses means the federal motor carrier regulations do not apply, is unavailing. They note N.J.S.A. 48:4-47, which established financial responsibility standards for buses, was last amended in 1972, so our Legislature would have recognized the statute's applicability to buses in 1985 when it enacted N.J.S.A. 39:5B-32 and instructed

the Superintendent to adopt the federal motor carrier standards, including financial responsibility standards as referenced in paragraph (e). The injured parties contend N.J.S.A. 39:5B-32, supersedes N.J.S.A. 48:4-47, raising the minimum financial responsibility for commercial buses operated in the State.

Thus, the injured parties contend the trial court erred in concluding the federal financial responsibility standards governing buses with a capacity of sixteen or more passengers were not adopted by reference in N.J.S.A. 39:5B-32 and N.J.A.C. 13:60-2.1. They urge us to reverse and conclude pursuant to the State's adoption of 49 C.F.R. 387, the minimum financial responsibility for liability arising out of operation of the bus is $5,000,000.

"The primary goal of statutory analysis is to understand and implement the Legislature's intent." State, Div. of State Police v. N.J. State Trooper Captains Ass'n, 441 N.J. Super. 55, 62 (App. Div. 2021) (citing State v. Rangel, 213 N.J. 500, 508 (2013)). The "'best indicator' of that intent, [is the] statute's plain language." Finkelman v. Nat'l Football League, 236 N.J. 280, 289 (2019) (quoting DiProspero v. Penn, 183 N.J. 477, 492 (2005)).

We "read each statutory provision 'in relation to other constituent parts so that a sensible meaning may be given to the whole of the legislative scheme.'" N.J. State Trooper Captains Ass'n, 441 N.J. Super. at 62 (quoting Wilson ex rel.

<u>Manzano v. City of Jersey City</u>, 209 N.J. 558, 572 (2012)). "[W]ords and phrases [are not viewed] in isolation but rather in their proper context and in relationship to other parts of a statute, so that meaning can be given to the whole of an enactment." <u>Id.</u> at 63 (quoting <u>Rangel</u>, 213 N.J. at 509). "[W]hen construing a statute, we presume that the Legislature created a logical scheme that avoids contradictions." <u>Ibid.</u>

At the outset, we note N.J.S.A. 39:5B-32 is part of a statutory scheme regulating the transport of hazardous materials and does not apply to commercial passenger buses. <u>See</u> <u>Rafanello v. Taylor-Esquivel</u>, 465 N.J. Super. 304, 314 (App. Div. 2020) ("In distinguishing vehicles transporting hazardous materials from the general class of motor vehicles, our Legislature enacted a statutory scheme[,] pursuant to N.J.S.A. 39:5B-1 to -32.").

The applicable statute here is N.J.S.A. 48:4-47. Aptly, it falls under Title 48 ("Public Utilities"), chapter 4 ("Autobuses"), article 7 ("Insurance Required for Certain Motor Vehicles Carrying Passengers for Hire"), subsection 47 ("Financial coverage required; insurance policy; filing with utility board; rejection; minimum and maximum liability for bodily injury or death"). <u>See also</u> <u>Huggins v. Aguilar</u>, 246 N.J. 75, 87 (2021) ("Motor vehicles used to carry passengers for hire must maintain liability coverage in amounts set by a

schedule, but far in excess of the $15,000/$30,000 limit identified in N.J.S.A. 39:6B-1(a). N.J.S.A. 48:4-47.").

Therefore, we reject the suggestion N.J.S.A. 48:4-47 is inapplicable here or was superseded by N.J.S.A. 39:5B-32. The trial court neither misinterpreted the law nor relied upon the wrong statute when it concluded the $5,000,000 federal limit did not apply.

III.

In A-2034-24, the Fuji parties contend the policy is an illegal contract in violation of the Omnibus Clause, N.J.S.A. 39:6B-1(a), which requires insurance to cover any person with permission to use a vehicle. They assert the statute embodies our State's public policy favoring financial protection of innocent accident victims. Our State also maintains a strong public policy favoring liberal construction of insurance coverage to provide the broadest range of protection.

The Fuji parties assert the "initial permission" doctrine applies, which holds once a driver is allowed to use a vehicle, the use is covered by the omnibus provisions of the policy. Our Supreme Court has consistently held that permissive motor vehicle users require coverage under N.J.S.A. 39:6B-1, and an "unlimited range of conduct" falls within its scope. Therefore, we must not enforce policy provisions which contradict statutorily mandated coverage.

The Fuji parties argue public policy requires insurance contracts to be construed against insurance companies because of an insured's lack of bargaining power in entering the contract. Such contracts are interpreted by recognizing the insured's reasonable expectations. The Fuji parties maintain the Approved Driver Endorsement provision of the Prime policy violates public policy and the Legislature's goal of ensuring coverage for permissive users like Mendoza-Bastidas. The provision acts as an illegal escape clause and is therefore void. The Fuji parties contend Prime must comply with the mandatory liability coverage requirements of N.J.S.A. 39:6B, and its policy should automatically be reformed to bring it into compliance.

The Fuji parties raise similar arguments with respect to the policy's indemnification and personal guarantee provisions. They claim they are being forced to accept an illegal contract in violation of the omnibus statute, despite having paid premiums of over $720,000. This has resulted in them having to accept lesser coverage and reimburse Prime for all costs, expenses, and settlement proceeds associated with the injured parties' underlying claim above $25,000. Thus, the policy should be voided ab initio.

"[A]n insurance policy is a contract, and like other contracts, the terms of the policy define the parties' rights and obligations." Webb v. Witt, 379 N.J.

24

Super. 18, 33 (App. Div. 2005). If "the terms of an insurance policy are clear, the court's function is to enforce the written contract, . . . not write for the insured a better policy of insurance than the one purchased." Ibid. (quoting Fairlawn Indus., Ltd. v. Gerling Am. Ins. Co., 342 N.J. Super. 113, 117 (App. Div. 2001)).

Although our State's "statutory scheme evinces a strong legislative policy in favor of protecting innocent accident victims, . . . an exclusion may be enforced if it is 'specific, plain, clear, prominent, and not contrary to public policy.'" Potenzone v. Annin Flag Co., 191 N.J. 147, 152 (2007) (internal citations omitted) (quoting Doto v. Russo, 140 N.J. 544, 559 (1995)). "[A] policy exclusion 'that conflicts with statutorily mandated coverage will not be enforced.'" Ibid. (quoting Proformance Ins. Co. v. Jones, 185 N.J. 406, 415 (2005)). "[W]hen an insurance policy violates public policy, it is as though the [insurance] policy never came into existence." Sun Life Assur. Co. of Canada v. Wells Fargo Bank, N.A., 238 N.J. 157, 187 (2019).

Prime's policy clearly contained omnibus provisions, such as the Approved Driver Endorsement, which covered permissive users, like Mendoza-Bastidas. Pursuant to this provision, the insured is responsible for ensuring its drivers meet the approved driver requirements under the policy, and if they do not, then those non-approved drivers will not be covered under the policy, "with

exception to the minimum amount of insurance required by any applicable federal or state financial responsibility law." This provision clearly gave notice Mendoza-Bastidas was covered, but only to the statutory minimums. It did not violate public policy. Our obligation is to enforce the clearly worded policy as written. The statutory minimums applied, not the policy limit of $5,000,000. The policy was not illegal.

IV.

Both the Fuji and the injured parties assert they were not afforded discovery. They claim there were numerous questions of fact, including: whether Prime ever offered a policy to the Fuji defendants covering permissive users; the fact Prime had a conflict by defending its insured in the personal injury matter while reserving its rights to deny coverage; and whether the Fuji parties gave Prime adequate notice of the accident.

"A motion for summary judgment is not premature merely because discovery has not been completed, unless [the opposing party] is able to 'demonstrate with some degree of particularity the likelihood that further discovery will supply the missing elements of the cause of action.'" Badiali v. N.J. Mfrs. Ins. Grp., 220 N.J. 544, 555 (2015) (quoting Wellington v. Est. of Wellington, 359 N.J. Super. 484, 496 (App. Div. 2003)). While "ordinarily[, a]

26

decision on . . . summary judgment should be withheld until completion of discovery, . . . discovery need not be undertaken or completed if it will patently not change the outcome." Minoia v. Kushner, 365 N.J. Super. 304, 307 (App. Div. 2004).

The trial court did not abuse its discretion by declining to deny summary judgment on account of the need for discovery. As we noted, the policy clearly covered permissive users, and there was no dispute Mendoza-Bastidas was a permissive user. The parties do not contest Mendoza-Bastidas was not an approved driver under the policy. The remaining issues, as the trial court correctly recognized, were questions of law.

Indeed, whether the Fuji parties provided late notice to Prime on the occurrence of the accident, had no bearing on the outcome. The Fuji parties acknowledge Prime sent a letter disclaiming coverage but stated it would handle the defense, subject to a reservation of rights. Regardless of the notice issue, the trial court's decision hinged on the undisputed fact the bus did not travel interstate. And as we noted in the preceding section, the trial court applied the correct law when it found Prime's coverage obligation was $25,000.

V.

To the extent we have not addressed an argument raised in either appeal, it is because it lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in A-1783-24 and A-2034-24.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Hanley

Clerk of the Appellate Division